**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THERESA INGARGIOLA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4: 20 CV 1776 DDN |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

This action is before the Court for judicial review of the final decision of the defendant Commissioner of Social Security denying the applications of plaintiff Theresa Ingargiola for disability insurance benefits (DIB) under Title II of the Social Security Act (Act).  The parties have consented to the exercise of plenary authority by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  For the reasons set forth below, the final decision of the Commissioner is affirmed.

## BACKGROUND

Plaintiff was born on August 5, 1957.  (Tr. 182.)  She protectively filed her applications for DIB on December 28, 2018. (Tr. 182-83.)  She alleged a disability onset date of June 1, 2016, and in her Disability Report, alleged disability due to multiple sclerosis (MS), attention deficit disorder (ADD), anxiety, depression, confusion, concentration, and pain.  (Tr. 182, 220.)  Her claims were denied, and she requested a hearing before an administrative law judge (ALJ).  (Tr. 75, 83-89.)

On April 23, 2020, following a hearing, the ALJ concluded that plaintiff was not disabled under the Act.  (Tr. 26-36.)  The Appeals Council denied review.  Accordingly,

the ALJ's decision became the final decision of the Commissioner subject to judicial review by this Court under 42 U.S.C. § 405(g).   (Tr. 1-6.)

## ADMINISTRATIVE RECORD

The following is a summary of plaintiff's medical and other history relevant to her appeal.

On September 2, 2016, plaintiff saw ophthalmologist Mark Spurrier, M.D. for possible cataracts.  Plaintiff reported difficulty with her near and distance vision, as well as difficulty focusing.  She reported a decline in her vision over the past three months.   Her visual acuity was 20/30 in her right eye and 20/30+ in the left.   Examination showed weakness of adduction in the right eye and nystagmus, or involuntary eye movement, of the right eye on attempted left gaze, as well as early-stage cataracts that were asymptomatic or only mildly symptomatic.   Dr. Spurrier diagnosed (1) internuclear ophthalmoplegia (INO), a disorder of conjugate lateral gaze in which the affected eye shows impairment of adduction, and (2) age-related, early-stage incipient cataracts bilaterally, and referred her to a neurologist.  He recommended that plaintiff have her glasses remade.  (Tr. 306-10.)

On September 7, 2016, plaintiff saw internist and primary care provider Adam Michael Ralko, M.D., for diplopia or double vision, depression with anxiety, and attention-deficit disorder.  She told Dr. Ralko that she "did not think much of" the double vision but that her eye doctor recommended further evaluation.  Plaintiff reported that while she was worried about the diplopia, she was "not limited by [it] at all" and reported having no other symptoms.  She denied blurry vision, floaters, or flashers.  Examination showed plaintiff was pleasant, well-appearing, and in no acute distress.   Neurological examination showed plaintiff to be alert and appropriate with full muscle strength throughout all extremities, intact sensation and reflexes, normal finger-nose-finger coordination, and a steady, normal-based gait.  Dr. Ralko diagnosed monocular diplopia in plaintiff's right eye and ordered an MRI of her brain for further evaluation.   Adderall, for ADD, and Wellbutrin, an anti-depressant, were continued.  (Tr. 265-67.)

On September 14, 2016, an MRI of her brain showed a pattern of extensive disease suggestive of a chronic demyelinating disease.  (Tr. 292.)

On October 18, 2016, plaintiff saw neurologist Amy Rauchway, D.O. at an initial visit for complaints of double vision.  Plaintiff told Dr. Rauchway that Dr. Spurrier added a prism to her eyeglasses, and since then she felt much better. no longer had blurry vision, and was able to work at a computer.  She reported no difficulty managing activities of daily living.  On examination, she was alert and oriented, with normal strength and tone, no sensory deficit, and a normal gait.  Coordination testing showed mild ataxia with heel-to-shin, but no dysmetria or inability to execute complex movement, on finger-to-nose.  She had mild ataxia, positive Romberg's (balance) testing, and a flicker of nystagmus, or involuntary, rapid, and repetitive movement, in her left eye, but other neurological testing was negative.  Eye examination revealed full visual fields, and visual acuity of 20/25 in both eyes.  Dr. Rauchway informed her that her MRI results were suggestive of multiple sclerosis.  (Tr. 390-93.)

On November 7, 2016, plaintiff saw Dr. Ralko for a routine physical. He noted that her recent MRI was suggestive of demyelinating disease, but that she was not limited at all by the diplopia and had no other symptoms.  Examination showed plaintiff to be pleasant, well-appearing, and in no acute distress. Neurologically, she was alert and appropriate, her cranial nerves were intact, she had full muscle strength throughout all extremities, intact sensation and reflexes, normal finger-nose-finger coordination, and a normal gait. (Tr. 387-90.)

A December 2, 2016 MRI of plaintiff's cervical spine showed disc degeneration predominantly at C5-C6 with very subtle areas of T2 hyperintensity in the upper cervical cord at C2 and C3.  (Tr. 423-25.)

Plaintiff followed up with Dr. Rauchway on December 9, 2016, to discuss her MRI results.  Her examination showed her speech to be mildly dysarthric (weakened or slurred) but fluent.  (Tr. 383-86.)

On January 3, 2017, plaintiff saw Dr. Spurrier for difficulty with her long distance vision in the right lens of her glasses. (Tr. 310.)

A January 27, 2017 CT scan of her chest showed small bilateral pulmonary nodules, measuring up to 5mm, questionable mild or early paraseptal emphysema in the right apex, sub centimeter low density hepatic lesions with a low-density rim calcified splenic mass and non-obstructing left renal calculus. (Tr. 419-20.)

On February 6, 2017, plaintiff saw Dr. Rauchway for continued complaints of double vision. Examination revealed slight dysmetria with placing her finger to nose, with mildly dysarthric speech. Romberg testing was positive. Dr. Rauchway prescribed Copaxone, an immunomodulator used to treat MS, and vitamin D, and referred her to a neurologist for evaluation of multiple sclerosis. (Tr. 373-76.)

Plaintiff saw Dr. Rauchway on May 8, 2017, for continued double vision. She reported having received three Copaxone injections in the past week, resulting in injection site redness, itching, and a crawling sensation in her leg. She reported fatigue and knocking objects over when trying to reach. On exam, plaintiff had slight dysmetria with her right finger-to-nose and positive Romberg testing. She reported plans to do volunteer work at a therapeutic horseback riding facility. (Tr. 368-70.)

A June 9, 2017 MRI of plaintiff's brain revealed "relatively stable disease without clear cut new lesions and no enhancing disease." (Tr. 415-16.)

On June 28, 2017, plaintiff saw ophthalmologist Michael P. Donahoe, M.D. for follow-up for her cataracts. She reported blurred visual acuity. On exam, plaintiff was positive for Duane's syndrome Type 1, an eye movement disorder present at birth (congenital) characterized by horizontal eye movement limitation, in her left eye. Dr. Donahoe noted that plaintiff had been diagnosed with MS but had no symptoms. She was instructed to return in one year for a comprehensive eye examination. (Tr. 721-25.)

On August 8, 2017, plaintiff saw Barry Singer, M.D., a neurologist, reporting mild fatigue due to her multiple sclerosis. He instructed her to start Tecfidera, an

- 4 -

immunomodulator used to treat MS, on October 24, 2017, and to have a blood workup a week later.   (Tr. 313, 317.)

On September 27, 2017, plaintiff saw Dr. Donahoe for pain and blurry vision.  She reported her eyes felt strained with a little bit of double vision.   Dr. Donahoe advised her to monitor any vision changes and discussed signs and symptoms of floaters.  (Tr. 716, 719-20.)

On October 11, 2017, plaintiff followed up with Dr. Singer.  She reported no changes in strength, balance, or vision.  She denied double vision or vertigo.  Plaintiff was volunteering twice a week with children with autism.  Examination showed plaintiff was alert, oriented, had fluent speech, and full muscle bulk and tone.   Finger-to-nose and heel-to-shin testing was normal.  Her gait and tandem gait were normal.  (Tr. 313-14.)

On January 24, 2018, plaintiff met with Melanie Huff, N.P., reporting that she had some mild fatigue, itchiness, redness, and gastrointestinal pain for a couple days after starting Tecfidera.  Nurse Practitioner Huff continued Tecfidera and prescribed Singulair, used to prevent asthma attacks.  (Tr. 318, 321.)

At a February 21, 2018 appointment with Dr. Singer, plaintiff's balance was mildly off, and she had tingling up to her knees.  She reported moderate depression and short-term memory problems.  Her tandem gait was mildly impaired, and she had a postural hand tremor.  Dr. Singer continued her medications.  (Tr. 321-23.)

On March 20, 2018, plaintiff saw Dr. Donahoe.  Early arcus, a common, age-related condition characterized by fatty deposits around the cornea, was noted in both eyes.  She was instructed to return in six months. (Tr. 710, 713, 715.)

On April 18, 2018, state agency physician Daniel Gwartney, M.D. reviewed the record evidence and found there was insufficient evidence to establish a severe impairment or combination of impairments prior to the date last insured.  (Tr. 70-71.)

On July 17, 2018, plaintiff saw Dr. Donahoe for bilateral decreased vision occurring over the past to three to four months.  She reported fluctuating vision, watery eyes, and

photophobia.  Dr. Donahoe noted poor abduction in her left eye and gaze nystagmus in her right.  (Tr. 703-07.)

On September 11, 2018, plaintiff saw Dr. Singer for follow-up.  She had stopped taking Tecfidera because it made her feel "strange."   She reported her balance was mildly off, and she had tingling up to her knees that occurred mostly in the evening.   On examination, her left Babinski sign or plantar reflex, was positive.  She had mild postural hand tremor bilaterally with a mildly impaired tandem gait.  (Tr. 482-83.)

On December 18, 2018, plaintiff saw Dr. Donahoe for difficulty with depth perception in her left eye and with shutting her left eye when walking.  (Tr. 696.)

At a March 28, 2019 follow up with Dr. Singer, plaintiff reported that her balance was off and that she was falling about once a week.  She had tingling/burning up to her knees in the evenings, as well as stiffness.  On examination, she had a mild postural hand tremor bilaterally with a mild impairment in tandem walking and positive left Babinski sign.  Dr. Singer referred her to  physical therapy.  (Tr. 479-80.)

On May 20, 2019, plaintiff saw ophthalmologist Josh E. Amato, M.D., for photophobia or light sensitivity for three months.  She reported light sensitivity, watering eyes, and fluctuating vision.  Dr. Amato noted inadequate tear film in both eyes and diagnosed tear film insufficiency of bilateral lacrimal glands and age-related bilateral nuclear cataract.  (Tr. 691-94.)

In June 2019, state agency physician Judee Bland, M.D., reviewed the record evidence and found that the evidence did not establish any severe impairments or combination of impairments as of plaintiff's date last insured in December 2016.  (Tr. 77-79.)

On June 27, 2019, psychiatrist Jay Liss, M.D. completed a Mental Medical Source Statement (MMSS).  He believed plaintiff had "marked" limitation in her ability to maintain the necessary concentration to persist at simple routine tasks; initiate and complete tasks in a timely manner; ignore or avoid distractions; sustain an ordinary routine and regular attendance; understand and learn terms, instructions and procedures; work a

full day without needing more than the allotted number or length of rest periods; and in regulating emotions, controlling behavior, and maintaining her wellbeing. (Tr. 678-79.)

Dr. Liss opined plaintiff had "moderate" limitations in following one or two step oral instructions to carry out a task; using reason and judgment to make work related decisions; functioning independently; distinguishing between acceptable and unacceptable work performances; keeping social interactions free of excessive irritability, argumentativeness, sensitivity, or suspiciousness; asking simple questions or requesting help; and responding appropriately to requests, criticism, suggestions, corrections, and challenges. He believed she would be 31% or more below the average pace of performance of simple tasks in a low stress environment. (Tr. 678-79.)

Dr. Liss believed plaintiff could not work in proximity to coworkers without being distracted by them or distracting them due to exhibition of abnormal behavior. She could perform in a setting where supervisors provide simple instructions for non-detailed tasks with no more than four supervisor contacts per day. He noted plaintiff's MS, and that "nothing is predictable or consistent." He believed plaintiff would be absent from work three times a month or more due to her psychologically based symptoms. Her mental impairments included depression, ADD, and a mood disorder secondary to her MS. The objective signs and symptoms she displayed included cognitive disability, weakness, and dysarthria (slurred or weakened speech). He believed that overall she would have difficulty working on a full-time sustained basis. (Tr. 680-81.)

On September 4, 2019, plaintiff saw Dr. Donahoe with complaints of blurry vision, mostly under bright lights and with pain at times. He diagnosed plaintiff with age-related nuclear cataracts with no treatment currently recommended. She was advised to monitor her vision for any worsening. She had poor abduction in her right eye and end gaze nystagmus in her left eye. Dr. Donahue diagnosed INO of her right eye. (Tr. 8, 14.)

On October 7, 2019, plaintiff saw Dr. Singer reporting intermittent tingling below her knees, moderate depression, short-term memory loss, and multitasking problems. She had a positive Babinski sign on the left, a mild postural hand tremor bilaterally, and

- 7 -

impaired tandem gait.  Dr. Singer continued Bupropion and Alprazolam and instructed her to follow up with Dr. Liss to discuss starting Cymbalta, an antidepressant also used to treat nerve disorders.  (Tr. 727-29.)

Plaintiff saw Dr. Ralko on November 11, 2019, for a physical, reporting short-term memory loss, problems with multitasking, tingling up to her knees, and mild balance disturbances.  She had a mild speech deficit on examination.  (Tr. 735, 740.)

On March 4, 2020, plaintiff saw Dr. Donahoe with ongoing complaints of blurry vision, as well as headaches with her new glasses.  (Tr. 16.)

On March 11, 2020, Dr. Singer completed an MS residual functional capacity (RFC) questionnaire.  He had treated plaintiff every six months since August 2017 for MS that was initially diagnosed by a brain MRI.  Her symptoms included balance problems, unstable walking, numbness/tingling or other sensory disturbances, increased muscle tension, difficulty with short-term recall, depression, double or blurred vision, anxiety, and multitasking issues.  (Tr. 781.)

Dr. Singer opined plaintiff would constantly experience pain, fatigue, or other symptoms severe enough to interfere with attention and concentration.  He opined she was able to walk less than one city block, sit for one hour before needing to get up, stand for 10 minutes before needing to sit, and sit/stand/walk less than two hours in a normal 8-hour workday.  He believed she required a job where she was able to shift positions from sitting, standing, or walking at will and would need unscheduled breaks at least every two hours. During an 8-hour workday, she could occasionally lift less than ten pounds, and never twist, stoop (bend), crouch, or climb ladders or stairs.  She should avoid all exposure to extreme heat and hazards, moderate exposure to extreme cold and humidity, and concentrated exposure to wetness, noise, and fumes/odors/dust/gases/poor ventilation.   Plaintiff's impairments were likely to produce good and bad days resulting in her being absent more than four days per month.  (Tr. 784-87.)

- 8 -

## ALJ HEARING

On April 7, 2020, plaintiff appeared and testified to the following before an ALJ. (Tr. 42-66.)  She could not keep her job because her eyes were unable to focus properly. Her onset date was around the time when she was initially diagnosed with MS.  She began medications shortly thereafter, but they caused side effects, and she had to try three different medications before she started Tecfidera, her current medication.  Her doctor told her that her MS was in her eyes, which is why her vision is so affected and why she does not drive.  (Tr. 46-48.)

She has taken medication for anxiety for over fifteen years.  She takes Xanax occasionally when she gets "real uptight and nervous."  During the relevant time period, she would get dizzy and need to sit down to do things such as get dressed.  She attempted to assist with tasks such as making dinner, but her left leg would begin to burn and tingle in the afternoon, making it difficult to stand up.  Her eyes could also not focus fast enough. When she feels unstable, she leans on walls or her husband's arm for support.  She is not yet dependent on an assistive device.  (Tr. 49-51.)

During the relevant time period, she attempted to return to work as a veterinary technician at the veterinary clinic where she worked; however, when she returned, she almost fell down and needed to hold onto things for balance.  She was unable to work full time because she got tired and could not stay focused. She had difficulty moving from sitting to standing and had difficulty measuring medications for the animals.  In addition to eye problems, when standing, her legs bothered her and tingled, requiring her to take multiple breaks during a part-time shift.  (Tr. 53-55.)

## DECISION OF THE ALJ

On April 23, 2020, the ALJ issued a decision finding that plaintiff was not disabled. (Tr. 29-37.)  At Step One, the ALJ found that plaintiff did not engage in substantial gainful activity between June 1, 2016, her alleged onset date, and December 31, 2016, her date last

insured.  (Tr. 31).  At Step Two, the ALJ found that plaintiff had medically determinable impairments of MS with short-term visual manifestations, degenerative disc disease of the cervical spine, depressive disorder, anxiety disorder, and ADD.  However, the ALJ determined that plaintiff did not have any impairment or combination of impairments that significantly limited her ability to perform basic work-related activities.  Accordingly, the ALJ determined that plaintiff did not have a severe impairment or combination of impairments prior to December 31, 2016, her date last insured.  (Tr. 31-36.)

The ALJ ended the sequential evaluation process at Step Two, and accordingly, concluded that plaintiff was not disabled under the Act.  (Tr. 36.)

## GENERAL LEGAL PRINCIPLES

In reviewing the Commissioner's denial of an application for disability insurance benefits, the Court determines whether the decision complies with the relevant legal requirements and is supported by substantial evidence in the record. *See* 42 U.S.C. 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009).  Substantial evidence is "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019); *Cox v. Astrue,* 495 F.3d 614, 617 (8th Cir. 2007).  The review considers not only the record for the existence of substantial evidence in support of the Commissioner's decision. It also takes into account whatever in the record fairly detracts from that decision.  *Cox v. Apfel,* 160 F.3d 1203, 1207 (8th Cir. 1998).  We may not reverse the Commissioner's decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because the Court would have decided the case differently.  *See Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to

- 10 -

last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); *Pate-Fires*, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987) (describing five-step process); *Pates-Fires*, 564 F.3d at 942.

Steps One through Three require the claimant to prove: (1) she is not currently engaged in substantial gainful activity; (2) she suffers from a severe impairment; and (3) her condition meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform her past relevant work (PRW). *Id.* § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to do so. *Pate-Fires*, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to her PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(a)(4)(v).

## DISCUSSION

Plaintiff asserts the ALJ erred at Step Two of the sequential evaluation process in not finding that her multiple sclerosis was severe. She also asserts the ALJ erred in evaluating the opinion evidence of her neurologist, Dr. Barry Singer.

### Multiple Sclerosis as a Severe Impairment at Step Two

Plaintiff contends the "bottom line" is that she suffers with MS with visual manifestations which is severe on its own but is even more so when considered in combination with her other non-severe impairments such as anxiety and depression. She argues her testimony, combined with the documented symptoms, limitations, and objective testing confirming the diagnosis of MS support her allegations of the severity of the condition and document symptoms that cause significant limitations in plaintiff's ability to

- 11 -

perform basic work activities.  Plaintiff asserts that because the ALJ erred in finding her impairment of MS is not severe, and did not proceed beyond Step Two, the decision not supported by substantial evidence.  Defendant Commissioner counters that the ALJ provided a thorough explanation of his determination, and substantial evidence supports his determination at Step Two for the period in question June 1 through December 31, 2016.  This Court agrees.

At Step Two of the evaluation process, the ALJ must determine if a claimant suffers from a severe impairment.  *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).  The claimant bears the burden of proving her impairment or combination of impairments is severe, but the burden is not a heavy one.  *Id.; Dewald v. Astrue*, 590 F. Supp.2d 1184, 1200 (D.S.D. 2008).  "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard. . . ."  *Kirby*, 500 F.3d at 707.  A severe impairment is an impairment or combination of impairments that significantly limits a claimant's physical or mental ability to perform basic work activities.  *See* 20 C.F.R. § 404.1520(c).  An impairment is not severe if it amounts to only a slight abnormality and does not significantly limit the claimant's physical or mental ability to do basic work activities.  *Kirby,* 500 F.3d at 707; 20 C.F.R. § 404.1522.  Basic work activities concern the abilities and aptitudes necessary to perform most jobs.  20 C.F.R. § 404.1522.  Examples of basic work activities include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.  *Id.*  The sequential evaluation process terminates at Step Two if the impairment has no more than a minimal effect on the claimant's ability to work.  *Kirby*, 500 F.3d at 707.

Here, the ALJ determined at Step Two that plaintiff's MS was not a severe impairment between June 1, 2016, her alleged onset date, and December 31, 2016, her date last insured, and stopped his analysis there.  After evaluating the record evidence, the ALJ

determined that the record showed that plaintiff had several medically determinable impairments, including MS.  (Tr. 31.)  The ALJ noted medical evidence from September 2016 included an abnormal brain scan that showed evidence of chronic demyelinating disease suggestive of MS.  (Tr. 33, 293, 432-33).  Plaintiff also exhibited INO in her right eye, also suggestive of demyelinating disease.  (Tr. 33, 309.)  This evidence supported finding that plaintiff had a medically determinable impairment of MS during the relevant period (Tr. 31, 33).

However, a medically determinable impairment is not necessarily a severe impairment.  Although the impairment was *medically determinable* prior to the expiration of her insured status, the ALJ determined that it was not a *severe* impairment during that timeframe.  (Tr. 31-35.)

In determining that plaintiff had not met her burden of establishing that her MS was a severe impairment prior to the expiration of her alleged onset date, the ALJ properly considered the consistency of plaintiff's subjective complaints with the other record evidence as well as prior administrative medical findings and medical opinion evidence. (Tr. 31-35).  The ALJ considered plaintiff's allegations that even prior to her date last insured, she had vision problems, difficulty performing household tasks, had to take breaks while performing tasks, had balance issues, and had trouble using a computer.  (Tr. 32, 51-57.)  However, the ALJ found these allegations to be inconsistent with the evidence of record for the insured period.  (Tr. 31-35.)

The ALJ considered contemporaneous statements plaintiff made to providers showing that although she was concerned about the possibility of having MS, she was not experiencing functional limitations that would preclude her from performing basic work activities during the relevant period.  (Tr. 33-35).  For example, the initial manifestation of plaintiff's MS was a visual abnormality in her right eye, but plaintiff told Dr. Ralko in September 2016 that she "did not think much of it" and said she was having "no other symptoms at all."  (Tr. 33, 265.)  She denied any other blurry vision, floaters, or flashers. (Tr. 266.)  She told providers in September and November 2016 that although she was

- 13 -

worried, she was not limited by the right eye diplopia or double vision "at all."  (Tr. 33, 265, 283.)  Plaintiff received new prescription eyeglasses in October 2016 and reported that since then she had felt much better and no longer had blurry vision.  (Tr. 33, 391.)  She reported being able to work at a computer and denied any difficulty managing activities of daily living.  (Tr. 33, 391.)  The ALJ noted that in October 2017, almost 10 months after the date last insured, plaintiff continued to deny strength changes, balance issues, double vision, or other vision changes.  (Tr. 34,  313.)

The ALJ also noted that the objective evidence during the relevant period was inconsistent with reports of functional limitations.  (Tr. 33-35.)  While plaintiff alleged a June 1, 2016 onset date, there is no record evidence of treatment until a September 2016 eye appointment.  (Tr. 306).  Her eye examination showed early-stage and asymptomatic or only mildly symptomatic cataracts in both eyes, and some weakness of adduction in the right eye and nystagmus, or involuntary eye movement, when she looked to the left, diagnosed as INO.  (Tr. 33, 308-09.)  Her vision was 20/30 in the right eye and 20/30+ in the left.  (Tr. 33, 307.)  A subsequent eye examination showed full visual fields and visual acuity of 20/25 in both eyes.  There was a "flicker" of nystagmus with overshoot of the left eye, but examination was otherwise unremarkable.  (Tr. 392.)  Physical examinations otherwise showed some positive findings such as "mild" ataxia with heel-to-shin testing and positive Romberg test, but otherwise showed intact coordination, full muscle strength and tone, no sensory or reflex deficits, and normal gait.  (Tr. 33-34, 266, 392.)  Plaintiff was observed to be well-appearing, alert, and oriented.  (Tr. 266, 392.)  The ALJ noted that she exhibited some dysarthric speech, but only mildly so, and that her speech was also described as fluent and conversant.  (Tr. 34, 385.)  The ALJ noted that in October 2017, several months after her insured status expired, examination continued to show normal muscle strength and tone, intact coordination, and normal gait.  (Tr. 34, 313-14.)

In addition to the record medical evidence, the ALJ considered the prior administrative findings and medical opinion evidence.  (Tr. 34-35).  For claims filed on or after March 27, 2017, such as this one, the revised regulations on medical opinion evidence

apply.  *See* 20 C.F.R. § 404.1520c ("How we consider and articulate medical opinions and prior administrative medical findings for claims filed on or after March 27, 2017").  The new regulations require the ALJ to explain how persuasive an opinion or prior administrative medical finding was and explain how the supportability and consistency factors were considered.  *See* 20 C.F.R. § 404.1520c.  The revised regulations significantly alter how the agency considers medical opinions and prior administrative medical findings. *See id.*  Under the revised regulations, the agency "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's own] medical sources."  20 C.F.R. § 404.1520c(a).

Here, the ALJ considered and found persuasive the prior administrative findings of state agency medical consultants Drs. Gwartney and Bland, who determined that plaintiff did not have a severe physical impairment or combination of impairments prior to the date last insured.  (Tr.  34, 70-71, 77.)  The ALJ noted that both doctors supported their findings with detailed narratives and that the findings were consistent with the record evidence.  (Tr. 34.)  As discussed above, aside from the MRI establishing the impairment of MS, the ALJ discussed that objective findings during the relevant period were unremarkable, and that plaintiff herself reported that she was not limited by the visual manifestations, nor did she have any other symptoms.  (Tr. 33-34, 265-66, 283, 307, 313, 385, 391-92.)  While an ALJ is not required to adopt prior administrative medical findings, the ALJ must consider this evidence as these medical consultants are highly qualified and experts in Social Security disability evaluation.  20 C.F.R. § 404.1513a(b)(1), (citing §§ 404.1520b, 404.1520c).

For all these reasons, the Court concludes the ALJ did not err at Step Two.

### Opinion of Neurologist Dr. Barry Singer

Plaintiff next argues the ALJ erred in his evaluation of her neurologist, Dr. Barry Singer because the ALJ failed to explain how the supportability and consistency factors were considered.  Plaintiff argues the ALJ failed to identify what evidence prior to her date

- 15 -

last insured is inconsistent with what parts of Dr. Singer's opinion.  She argues the fact that Dr. Singer was asked to complete a form that has check box options does not affect the credibility of his opinion, and if the ALJ had issues with the form of Dr. Singer's opinion, he could have recontacted Dr. Singer.   Plaintiff further contends that the fact that Dr. Singer's opinion does not provide much narrative explanation should not reflect poorly on his opinion because he completed the form that was provided to him.  She notes that contrary to the opinions of state agency consultants, treating doctors provide treatment notes that help to understand and substantiate their opinions versus state agency doctors who do not examine the claimant and are only able to provide a written explanation of their opinion.  She argues that whether the objective findings before the date last insured reflecting minimal abnormalities is a question for a medical professional and not the ALJ.

Plaintiff applied for benefits after March 27, 2017, and therefore the ALJ applied the new set of regulations for evaluating medical evidence.  *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15,132 (Mar. 27, 2017)).  The revised regulations redefine how evidence is categorized, including "medical opinion" and "other medical evidence," and how an ALJ will consider these categories of evidence in making the RFC determination.  *See* 20 C.F.R. §§ 404.1513(a), 404.1520c.

The new rules provide that adjudicators evaluate all medical opinions and findings using the factors delineated in the new regulations.  Supportability and consistency are the most important factors and their application must be explained.  Other factors which "will be considered" and about which adjudicators "may but are not required to explain" are the medical source's "treatment relationship" with the claimant, including the length, frequency, purpose and extent of the treating relationship, and whether the source has an examining (as opposed to non-examining) relationship with the claimant; specialization; and "other factors" such as whether the source has familiarity with other evidence in the claim or understanding of the SSA disability program's policies and evidentiary requirements.  *See* 20 C.F.R. § 404.1520c(b), (c) (2017).

- 16 -

Under the new regulations, a "medical opinion" is a statement from a medical source about what an individual can still do despite his impairments and includes limitations or restrictions about the ability to perform physical, mental, sensory, and/or environmental demands of work. 20 C.F.R. § 404.1513(a)(2). A medical opinion does not include judgments about the nature and severity of an individual's impairments, medical history, clinical findings, diagnosis, response to prescribed treatment, or prognosis. 20 C.F.R. § 404.1513(a)(3).

Here, Dr. Singer completed a MS Residual Functional Capacity Questionnaire finding plaintiff to have significant physical functional limitations, but not until March 2020, several years after plaintiff's insured status expired in December 2016. (Tr. 216, 781-88.) Nonetheless, the ALJ expressly considered the opinion and found that *for the period at issue*, it was not supported by Dr. Singer's own records or consistent with the other record evidence. (Tr. 35.) The ALJ considered that Dr. Singer did not include a narrative explanation in the opinion itself, nor did he begin treating plaintiff until sometime in 2017. (Tr. 35, 781-88.) The ALJ also considered that Dr. Singer's examination of plaintiff in October 2017 showed no strength or balance deficits, no vision changes, no double vision, and no vertigo. (Tr. 33, 313.) Plaintiff reported that she was volunteering for children with autism twice a week at that time, and examination showed full muscle bulk and tone, intact coordination, and normal gait. (Tr. 313-14.) While plaintiff's condition may have deteriorated by the time the ALJ issued his April 2020 opinion, the ALJ properly determined that these limitations were not supported for the period at issue here. The ALJ further determined that the limitations in the opinion were inconsistent with the record evidence for the relevant period. (Tr. 35.) As discussed above, objective findings on examination during the relevant period were unremarkable and plaintiff herself reported that she was not limited by the visual manifestations, nor did she have any other symptoms throughout the relevant period. (Tr. 33-34, 265-66, 283, 307, 313, 385, 391-92.) The ALJ properly considered Dr. Singer's opinion.

## VI.  CONCLUSION

For the reasons set forth above, the Court concludes the ALJ did not err at Step Two in not finding that plaintiff's MS was a severe impairment or in evaluating opinion evidence of neurologist Dr. Barry Singer.  The decision of the Commissioner of Social Security is affirmed.  A separate Judgment Order is issued herewith.


_____/s/ David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**

Signed on June 27, 2022.